IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STACIE HARRIS,                      )
                                    )
            Plaintiff,              )
                                    )
    v.                              )       1:19CV1262
                                    )
BOJANGLES' RESTAURANTS, INC.,       )
                                    )
            Defendant.              )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Summary
Judgment filed by Defendant Bojangles' Restaurants, Inc.
("Defendant" or "Bojangles"), (Doc. 16), to which Plaintiff has
responded, (Doc. 18), and Defendant has replied, (Doc. 20). This
motion is ripe for adjudication. For the reasons stated herein,
this court will grant Defendant's motion.

**I.    <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

**A.    <u>Parties</u>**

Defendant is a corporation with a business location in
Stokes County, North Carolina, and a registered agent in
Raleigh, North Carolina. (Complaint ("Compl.") Doc. 1 ¶ 4;
Doc. 7 ¶ 4.) Plaintiff is a resident of Stokes County, North
Carolina. (Doc. 1 ¶ 3.) Plaintiff was an employee of Defendant

at a restaurant in King, North Carolina. (Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") (Doc. 17 at 1); Pl.'s Resp. in Opp'n to Def.'s Mot. ("Pl.'s Resp.") (Doc. 18) at 1.)

## B.    **Procedural History**

Plaintiff filed this action on December 30, 2019, (Compl. (Doc. 1)), alleging that Defendant subjected Plaintiff to sexual discrimination and retaliatory termination in violation of Title VII of the Civil Rights Act of 1964, (id. ¶¶ 1, 48-56). Defendant filed an Answer on February 14, 2020. (Doc. 7.)

On December 2, 2020, Defendant filed this motion for summary judgment, (Doc. 16), and accompanying brief, (Def.'s Br. (Doc. 17)). Plaintiff responded on December 30, 2020, (Pl.'s Resp. (Doc. 18)), and Defendant replied on January 13, 2021, (Reply Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") (Doc. 20)).

This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## C.    **Factual Background**

A majority of the facts are described here, but additional relevant facts will be addressed as necessary throughout the opinion. The majority of facts are not disputed, and any material factual disputes will be specifically addressed in the relevant analysis. The facts described in this summary are taken

in a light most favorable to Plaintiff. Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiff was a Unit Director, or store manager, at a
Bojangles restaurant in King, North Carolina, from 2015 to 2018.
(Appendix to Pl.'s Resp., Ex. 2, Excerpts from the Deposition of
Stacie Harris ("Harris Dep.") (Doc. 19-2) at 6-7[1]; Def.'s Br.
(Doc. 17), Declaration of Jeannine M. Eubanks ("Eubanks Decl.")
(Doc. 17-1) ¶ 7.) Plaintiff began working for Bojangles in 2008
as a shift manager, before being promoted to Assistant Unit
Director and Unit Director in 2015. (Harris Dep. (Doc. 19-2) at
6-7; Eubanks Decl. (Doc. 17-1) ¶ 7.) Plaintiff's employment was
terminated on May 10, 2018. (Eubanks Decl. (Doc. 17-1) ¶ 7.)

Plaintiff's claims arise from two different factual
scenarios. First, Plaintiff alleges that she was subjected to
discriminatory conduct by a male supervisor, Thomas Fauber,
between February 2018 and May 2018. Second, Plaintiff alleges
that her termination occurred in retaliation for her complaints
about that conduct, for which the relevant events occurred
between April 23, 2018, and May 10, 2018. This court first

---

[1] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

describes the facts of the alleged discrimination, then describes the facts relevant to Plaintiff's termination.

### 1. **Plaintiff's Allegations as to Fauber's Sexual Harassment (February 2018 – May 4, 2018)**

Fauber became the Area Director for the King restaurant in February 2018. (Harris Dep. (Doc. 19-2) at 19.) Defendant's Area Directors are responsible for overseeing the operation of five to eight restaurants and serve as the immediate supervisor for each restaurant's Unit Director. (Eubanks Decl. (Doc. 17-1) ¶ 21.)

Plaintiff testified during her deposition that, during the first Unit Director meeting after Fauber became her Area Director, Fauber played with Plaintiff's hair and gave her a tight hug. (Harris Dep. (Doc. 19-2) at 24-25.) Plaintiff also testified during her deposition that when Fauber would come into the restaurant, he would touch the arms, backs, hips, hands, and hair of female employees, including Sheila Jester, Morgan McIntosh, Allison Shelton, Adriannah Horton, and Michelle Collins. (Id. at 20-21.) Plaintiff stated that Fauber visited the restaurant "every week, sometimes twice a week." (Id. at 19.)

Plaintiff testified that she met with Fauber and Ben Boyd, Fauber's supervisor and the Regional Vice President of Operations for the area in which the King restaurant was

located, (Eubanks Decl. (Doc. 17-1) ¶ 22), to discuss Fauber's
conduct, (Harris Dep. (Doc. 19-2) at 18, 25-27). Plaintiff
testified that, after the meeting, Fauber left her off an email
about a vendor's ranch dressing shortage, and did not return the
manager book for a manager trainee, delaying the hire. (Id. at
55-58.)

On May 4, 2018, Plaintiff sent an email to Defendant's "HR
Employee Mgmt" email address, in which Plaintiff alleged that
Fauber "has [come] into my store and put his hands on the
females that work there. He has asked to meet them outside of
work. He has made everybody feel very uncomfortable. I have
tried to contact his supervisor, Ben [Boyd], but he will not
respond." (Appendix (Doc. 17-2) at 57; Eubanks Decl. (Doc. 17-1)
¶ 35.) Plaintiff wrote that Fauber "has told me 'Ben said I AM
YOUR BOSS AND WHAT I SAY GOES' So I guess this is the reason he
will not respond." (Appendix (Doc. 17-2) at 57.) Plaintiff also
stated in her email that she was sending "a certified letter
with statements" to Bojangles' corporate office. (Id.)

Jeannine Eubanks, Bojangles' Senior Director of Human
Resources, (Eubanks Decl. (Doc. 17-1) ¶ 5), forwarded
Plaintiff's email to Boyd and discussed it with him, (id. ¶ 36).
Eubanks stated in her declaration that because Plaintiff's email
did not allege that Plaintiff had been harassed and stated that

Boyd had not been informed, she believed it was appropriate for Boyd to investigate the allegations. (Id.)

On May 8, 2018, Plaintiff sent a certified letter to Defendant describing her allegations against Fauber. (Appendix (Doc. 17-2) at 59, 65.) Harris stated during her deposition that she wrote the letter on or around May 4, 2018. (Id. at 23.) The Post Office had estimated that the letter would arrive on May 10, 2018, (id. at 65), although neither Plaintiff nor Eubanks remember the date of its arrival, (id. at 32-33; Eubanks Decl. (Doc. 17-1) ¶ 37). Eubanks stated that the letter was received after Plaintiff's employment had been terminated. (Eubanks Decl. (Doc. 17-1 ¶ 40.)

Eubanks investigated Plaintiff's allegations, visiting the restaurant to conduct interviews. (Eubanks Decl. (Doc. 17-1 ¶ 38.) Eubanks "concluded that Ms. Harris's allegations were not credible." (Id.)

## 2.   **Plaintiff's Termination (April 23, 2018 - May 10, 2018)**

Defendant has a "drug-free workplace policy," which prohibits the "unlawful use, possession, purchase, sale, distribution or being under the influence of any illegal drug and/or the misuse of legal drugs while on company premises or while performing service for the company." (Id. ¶ 17; id. at

16.) Bojangles expected Unit Directors, including Plaintiff, to enforce this policy. (Id. ¶ 19.)

On April 23, 2018, Pearl Woodard, a former Bojangles employee, called Defendant's Employee Awareness Hotline to report several complaints about Plaintiff. (Id. ¶ 15.) Among her complaints, Woodard reported that Plaintiff had failed to terminate Chris Ledford, another employee, after he had been observed smoking marijuana on the job. (Id. ¶¶ 16, 24; id. at 22.) The hotline operator wrote a summary of Woodard's complaints, (id. ¶ 15), and emailed it to Eubanks, as well as other Bojangles employees with responsibility for operations in the geographic area that included the King restaurant, (id. ¶ 15; id. at 22).

As Area Director for the King restaurant, Fauber began an investigation into all of the allegations in Woodard's complaint. (Id. ¶¶ 20-21.) Fauber spoke by phone with Woodard and in person with several other employees at the restaurant. (Id. at 25-26.) On April 25, 2020, Fauber wrote an email to Boyd summarizing his findings:

> [Woodard] stated last week there was a team member by the name of Chris that was caught smoking weed in the dumpster pad and Stacie suspended him for it but she said this is a drug free work zone and managers are made to take a drug test why would we no[t] terminate someone for this act and not just suspend them. [Woodard] knew about this act because the whole store

was talking about it and couldn't believe he still had
a job.

(Id. at 26.) Fauber also wrote that he had spoken with two of
the restaurant's Assistant Unit Directors, who told him that the
allegation "was true" and that they "didn't understand why
[Ledford] wasn't terminated." (Id.) Fauber wrote that one of the
Assistant Unit Directors with whom he had spoken was the
employee who had caught Ledford smoking marijuana and who had
reported the incident to Plaintiff. (Id.)

Moreover, Fauber wrote that, as he was speaking to the two
Assistant Unit Directors, Plaintiff ran into the store "in
street clothes" because someone had told her that Fauber was
interviewing employees. (Id.) Fauber wrote that he told
Plaintiff that he was conducting an investigation and that "she
could help or go home." (Id.) Fauber wrote that Plaintiff was
"very determined" to find out who sent the complaint, but he did
not disclose that information to her. (Id.)

Boyd forwarded Fauber's email to Eubanks on April 26, 2018,
asking for guidance for how to handle the situation. (Id. at
24-25.) Eubanks replied to Boyd's email an hour later and copied
Vickie Smith, Bojangles' Vice President for Human Resources.
(Id. at 24.) Eubanks wrote, "[b]ased on this report, I think we
need to terminate [Harris]." (Id.) She recommended that Boyd
obtain written, signed statements from the Assistant Unit

Directors, that Fauber speak to everyone in the restaurant and conduct additional research, and that Boyd suspend Plaintiff pending the outcome of further investigation. (Id.) Smith replied an hour after Eubanks' email, stating that Plaintiff "should be fired if she in fact did not terminate the employee who was found to be smoking pot on our premises." (Id.)

Following this correspondence, Boyd began reviewing records and interviewing witnesses. (Id. ¶ 28.) Eubanks also reviewed Defendant's employment records to determine whether Ledford had been terminated. (Id.)

Defendant's timekeeping records indicated that Ledford worked regularly throughout March and April, and that Ledford worked his last shift on April 20, 2018. (Doc. 19-7 at 2.) Ledford remained an active employee in Defendant's payroll system until April 30, 2018, when Plaintiff entered a termination transaction for Ledford. (Eubanks Decl. (Doc. 17-1) ¶ 29; id. at 29.) Plaintiff indicated in the termination transaction that it was an involuntary termination for a policy violation, and under the termination notes, Plaintiff indicated that Ledford "[w]ent out back door without permission. Alarm went off." (Id. at 29.) Plaintiff indicated that he was eligible for rehire. (Id.)

Plaintiff testified during her deposition that, between May 1-3, 2018, Plaintiff learned that Fauber was at the restaurant asking questions about Ledford and Plaintiff. (Appendix (Doc. 17-2) at 39-40.) Plaintiff was on vacation at the time. (Id.) Plaintiff testified that Ledford called her because Fauber had asked him to write a letter saying that Plaintiff was a bad manager. (Id. at 44.) Plaintiff testified that other employees at the restaurant called her during this time period, as well. (Id. at 40-41.) Plaintiff testified that she returned to the restaurant on either May 2 or May 3, 2018, despite being on vacation, to talk to employees at the restaurant. (Id. at 41.) Plaintiff testified that when she asked Fauber why he was at the restaurant, he told her that "they were doing an investigation," but did not explain what he was investigating. (Id. at 42.) Plaintiff testified that Fauber "told [Plaintiff] to leave and not to talk to any employees." (Id.) Although Plaintiff left and did not contact any employees, Plaintiff testified that other employees contacted her. (Id. at 42-43.) During her deposition, Plaintiff testified that she was "upset" about the investigation, and that she "knew that [Fauber] did not like [her], so [she] was concerned[.]" (Id. at 43.)

Boyd, Fauber, and Eubanks spoke regularly as the investigation continued, and they ultimately determined that Plaintiff's employment should be terminated. (Eubanks Decl. (Doc. 17-1) ¶ 32.) Eubanks stated that she, Fauber, and Boyd decided to terminate Plaintiff's employment prior to the end of Plaintiff's vacation on May 10, 2018. (Id. ¶ 33.)

Boyd and Fauber met with Plaintiff on May 10, 2018 to notify her that she had been fired. (Id. ¶ 34.) Plaintiff testified during her deposition that Boyd told her that they had conducted an investigation and that "based on their findings they were terminating [her] for unethical practices." (Harris Dep. (Doc. 19-2) at 55.)

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. If the "moving party discharges

its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co., 475 U.S. at 586-87). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

When considering a motion for summary judgment, courts must "construe the evidence in the light most favorable to . . . the non-moving party. [Courts] do not weigh the evidence or make credibility determinations." Wilson v. Prince George's Cnty., 893 F.3d 213, 218-19 (4th Cir. 2018).

## III. **ANALYSIS**

### A. **Sex Discrimination Claims**

#### 1. **Plaintiff's Claims**

As a preliminary matter, this court addresses the nature of Plaintiff's sex discrimination claims, as the parties dispute which claims Plaintiff has raised.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-

2(a)(1). Title VII creates liability for a hostile work environment, which occurs where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). Title VII also prohibits quid pro quo harassment, which refers to situations where "an employee's receipt of a job-related benefit or detriment depended on the employee's reaction to a supervisor's unwelcome sexual harassment." Brown v. Perry, 184 F.3d 388, 393 (4th Cir. 1999).

In her Complaint, Plaintiff alleges that "Harris is female, a member of a protected class"; Fauber "engaged in unwelcome conduct of a sexual nature"; "Harris was terminated"; and "[t]here is a causal connection between Harris's termination and her acceptance or rejection of [Fauber's] unwelcome conduct." (Compl. (Doc. 1) ¶¶ 48-51.) On its face, Plaintiff's Complaint appears to state a single claim for quid pro quo harassment, not a hostile work environment claim. See Okoli v. City of Baltimore, 648 F.3d 216, 222 (4th Cir. 2011).

In her Response to Defendant's motion, however, Plaintiff addresses what she refers to as her "hostile work environment

claim under Title VII without a tangible employment action,"
(Pl.'s Resp. (Doc. 18) at 10-11), reciting the conventional
elements for a hostile work environment claim, see Crockett v.
Mission Hosp., Inc., 717 F.3d 348, 354 (4th Cir. 2013), in
addition to addressing what she refers to as her "hostile work
environment claim where there is a tangible employment action,"
(Pl.'s Resp. (Doc. 18) at 13-14), reciting the elements for a
quid pro quo claim, Okoli, 648 F.3d at 222. Defendant argues
that Plaintiff has "attempt[ed] to coin a new cause of action,"
(Def.'s Reply (Doc. 20) at 7), in which there can be "quid pro
quo" harassment "in the absence of sexual advances," (id. at 8).

This court agrees. Contrary to Plaintiff's assertions,
Title VII recognizes a single hostile work environment claim,
which is separate and distinct from a quid pro quo claim. See
Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998)
(distinguishing the elements of a quid pro quo claim from a
hostile work environment claim).

Despite how Plaintiff has presented her claims in her
Complaint and named them in her Response, it appears that
Plaintiff attempts to raise two sex discrimination claims
against Defendant - one for a hostile work environment, and a
second for quid pro quo harassment. (See Pl.'s Resp. (Doc. 18)
at 10-17.) In the absence of any dispute from Defendant, (Def.'s

Br. (Doc. 17) at 12-17; Def.'s Reply (Doc. 20) at 7-8), this court will construe the pleadings to allege two claims.

## 2. **Plaintiff's Hostile Work Environment Claim**

Under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Plaintiff carries the initial burden of establishing the prima facie case. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). To prevail on a hostile work environment claim, a plaintiff must present evidence that "(1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Crockett, 717 F.3d at 354.

"The severe or pervasive element has both a subjective and objective component." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). At summary judgment, a plaintiff must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." Id. (internal quotations omitted). The objective inquiry is not a "mathematically precise test." Harris, 510 U.S. at 22.

Defendant argues that this court should grant summary judgment to Defendant as to Plaintiff's hostile work environment

claim on the grounds that the conduct did not amount to a hostile work environment as a matter of law, (Def.'s Br. (Doc. 17) at 12-15), and Plaintiff "fail[ed] to take advantage of preventative or corrective opportunities Bojangles' provided" to address sexual misconduct in the workplace, (id. at 16).

In response, Plaintiff argues that Fauber's conduct was sufficiently pervasive to create an abusive work environment for Harris and her female employees, (Pl.'s Resp. (Doc. 18) at 10-13); that "[t]he nexus between Harris's rejection of [Fauber's] conduct and her termination establishes a harassment claim," (id. at 13); and that Defendant's asserted affirmative defense fails because Plaintiff followed Bojangles' policy by complaining to Boyd, (id. at 15-17).

### a. <u>Evidence of Discriminatory Conduct</u>

The parties dispute how many incidents of touching are supported by the evidence on the record. Plaintiff argues that "Fauber was in Harris's store at least once a week for a period of months rubbing and touching on the female employees," (Pl.'s Resp. (Doc. 18) at 12), and that Fauber "put his hands on" Sheila Jester, Morgan McIntosh, Allison Shelton, Adriannah Horton, and Michelle Collins, (id. at 3 (citing Plaintiff's deposition testimony (Harris Dep. (Doc. 19-2) at 20-21)). Defendant argues Plaintiff "attempts to substitute the

allegations she made in her last-minute, post-investigation complaints to Bojangles . . . with her testimony about what she actually observed," resulting in a "fictionalized" account of "weekly rubbing and touching involving half a dozen employees" with "no support in the evidence," (Def.'s Reply (Doc. 20) at 4.)

Whether the parties' arguments are supported by the facts on the record is relevant to Plaintiff's claims. Although "the primary focus in hostile work environment analysis is on the plaintiff's experience, evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim." Perkins, 936 F.3d at 209-10. Given the parties' dispute, this court makes the following findings regarding the evidence before this court, taking all facts in the light most favorable to Plaintiff.

This court finds that Plaintiff has presented evidence, in the form of the letter Plaintiff mailed to Defendant on May 8, 2018, (Appendix (Doc. 17-2) at 59, 65), that Fauber had inappropriately touched her on three occasions, in addition to alleging that an unspecified number of employees had complained to her about Fauber. In the letter, Plaintiff wrote:

> I am writing this statement to inform Bojangles that
> Thomas Fauber, my Area Director, has made me feel very
> uncomfortable. He has hugged me on three different
> occasions. Squeezing me tight and rubbing my back. All

three times I shook loose and gave him a go to hell look. He has rubbed my arms and back on numerous occasions. He has played with my hair and twirled my pony tail.

The first time he hugged me was after a UD meeting in Mt. Airy. He was talking to me and he started playing with my hair. I was caught off guard and took two steps away from him. He then told me we were going to get along great and gave me a tight hug. I shook loose and gave him a disgusted look. He smiled and I walked off.

The second time he hugged me was when I had requested a meeting with Ben Boyde because I was not happy with how things were going with Mr. Fauber. I ask to meet with Ben Boyde to discuss this situation. Mr. Boyde invited Mr. Fauber to the meeting and I did not feel comfortable discussing everything with both of them sitting there. When Mr. Fauber got ready to leave he said "Come on, give me a hug." Again he hugged me tight against him and rubbed my back. I pushed free and he replied "OK, I'll be seeing ya."

The third time Mr. Fauber hugged me I called him and requested a meeting with him after he sent me an email I did not like. He said he could meet me at Reynolda Road Bojangles. I drove there from King. We talked. When I got ready to leave he said we were going to work great together and hugged me again. I pushed him away, shook my head and left.

A couple of days later Mr. Fauber came into my store. We were in the hallway having a discussion. He rubbed my arm and hand. I told him "Get your fucking hands off of me[.]"

As the UD of the store I have had employees tell me how Mr. Fauber has touched them and they do not like it. I have had a manager call me and tell me the AD called her at 10pm and asked to meet her away from the store.

Thomas Fauber has told me that Ben Boyde has let him know that he is in charge and what he says goes. I

> have tried to call Mr. Boyde to talk to him about
> these problems. He would not answer my calls.

(Id. at 59.) During her deposition, Plaintiff described Fauber as playing with her hair in the first incident for, "[m]aybe a second," (id. at 29-30), the hug in the first incident as lasting "three or four seconds," (id. at 30), the hug and back rub in the second incident as lasting "four seconds," (id.), and the hug in the third incident as lasting "a couple of seconds." (Id.) Plaintiff also stated during her deposition that she did not leave any incidents of touching out of her letter. (Id. at 24.)

Attached to Plaintiff's letter were three written statements from other restaurant employees, many of which were unsigned. (Eubanks Decl. (Doc. 17-1) ¶ 37; Appendix (Doc. 17-2) at 61-64.) During her deposition, Plaintiff identified the letter writers as Sheila Jester, Becky Skipper, and Stephen Painter and testified that she asked the writers to write the letters. (Harris Dep. (Doc. 19-2) at 34-36.)

Jester wrote in her letter, (see id. at 34), that Fauber had "rubb[ed]" her inappropriately and "ask[ed] to meet at other locations besides [B]ojangles establishments," which made her "feel very uncomfortable at times," (Appendix (Doc. 17-2) at 61). She also wrote that other women had shared similar experiences. (Id.) During her deposition, however, Jester stated

that Fauber never touched her in a way that she felt was inappropriate, never saw him touch other women in a way that she felt was inappropriate, and never heard Fauber say anything inappropriate. (Id. at 79.)

Moreover, Skipper stated in her letter, (see Harris Dep. (Doc. 19-2) at 35), that she saw Fauber standing "really close" to Jester "gently rubbing her and caressing her on the back," (Appendix (Doc. 17-2) at 62). During her deposition, however, Skipper stated that she never heard Fauber say anything appropriate, never personally complained about Fauber, and he did not attempt to meet with her outside of work. (Doc. 20-4 at 2.)

In his signed letter, Painter described an incident that occurred at one of the biweekly manager meetings at the Mt. Airy restaurant, in which he "noticed" that Fauber was hugging Plaintiff, and "sensed that there was awkwardness from the expression on [Plaintiff's] face." (Appendix (Doc. 17-2) at 64.)

Finally, Plaintiff has submitted the deposition testimony of Morgan McIntosh, another restaurant employee, who stated that Fauber made her feel "uncomfortable on multiple occasions." (Appendix to Pl.'s Resp., Ex. 5, Excerpts from the Deposition of Morgan McIntosh (Doc. 19-5) at 7.) McIntosh stated that, prior to Plaintiff's termination, Plaintiff had asked her to write a

letter describing the conduct "[s]o we could get [Fauber] out of Bojangles'." (Id.) In the letter, McIntosh stated that Fauber "once ran his hand from one shoulder to the other across my back as he passed me," (id. at 18), and that, in subsequent incidents, he "rubbed [her] arms, grabbed [her] shoulders and brushed up against [her] in an almost intentional manner." (Id.) McIntosh stated that she was "not the only female that feels this way," (id. at 8), and that Harris had tried to bring this to the attention of Boyd, but he dismissed the accusations, (id. at 8-10, 18). McIntosh stated during her deposition that she did not witness Fauber touch Lester or hear him say anything inappropriate to her. (Id. at 9.)

Plaintiff has also presented evidence regarding a second letter McIntosh wrote after this litigation commenced. In this letter, McIntosh stated that she had falsely denied that Fauber had acted inappropriately toward her or that she had witnessed him behaving inappropriately toward other employees. (Id. at 11-13, 19.) McIntosh stated during her deposition that she had written this letter at Fauber's request because she was afraid of losing her job. (Id. at 12-13.)

During her deposition, Plaintiff also testified that Allison Shelton, Adriannah Horton, and Michelle Collins complained about Fauber touching their arms, backs, hips, hands,

and hair, although she did not indicate that she witnessed him touching them. (See Harris Dep. (Doc. 19-2) at 20-23.)

Taking the aforementioned records and deposition testimony in the light most favorable to Plaintiff, this court finds that Plaintiff has presented evidence of three incidents in which Fauber hugged or touched Plaintiff, each lasting a few seconds. Moreover, this court finds that Plaintiff has presented evidence that Painter witnessed Fauber hugging Plaintiff on one occasion. This court will not make a finding, however, as to whether this hug occurred during the Unit Directors' meeting described in the first incident in Plaintiff's letter, or on a separate occasion.

This court further finds that Plaintiff has presented evidence that Fauber touched McIntosh in a way that made her feel uncomfortable.

This court recognizes that the evidence as to Skipper and Jester's claims are tenuous at best, as Jester's letter and deposition, and Skipper's letter present competing evidence as to whether Fauber touched Jester inappropriately. At summary judgment, this court may consider only admissible evidence. See Fed. R. Civ. P. 56(c); Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251-52 (4th Cir. 1991). "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." Orsi v. Kirkwood,

999 F.2d 86, 92 (4th Cir. 1993). "In particular, a letter must be attached to an affidavit and authenticated by its author in the affidavit or a deposition." Id. (internal quotations omitted). Jester and Skipper's letters would not ordinarily be admissible, as they are unsworn statements contradicted by their sworn deposition testimony.

Nevertheless, this court construes the evidence in the light most favorable to Plaintiff and finds that Plaintiff has presented evidence that Fauber touched Jester inappropriately. "[E]vidence of how others were treated in the same workplace can be relevant to a hostile work environment claim," Perkins, 936 F.3d at 209-10. The evidence before this court is that Plaintiff was aware only of the statements in the letters at the time that she complained of Fauber's conduct, and thus, supports an inference that she believed that other employees had also experienced inappropriate touching, which would normally support a claim for a hostile work environment. See id. For this reason, and because this court will dismiss the claim on other grounds, this court will consider Jester and Skipper's statements in the light most favorable to Plaintiff.

Finally, although Plaintiff has not presented specific corroborating evidence from Shelton, Horton, and Collins describing the nature and frequency of incidents in which Fauber

is alleged to have touched them inappropriately, taking Plaintiff's deposition testimony in the light most favorable to Plaintiff, this court will find that Plaintiff has presented evidence that Shelton, Horton, and Collins complained to Plaintiff about Fauber having touched their arms, backs, hips, hands, and hair.[2]

> **b.   A Reasonable Jury Could Not Conclude from the Evidence that Fauber's Conduct Created a Hostile Work Environment**

This court finds that Plaintiff has not created a genuine dispute of material fact that Fauber's conduct toward her was objectively severe or pervasive.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[N]o single factor is required." Id. "[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test," EEOC v.

---

[2] These statements from Shelton, Horton, and Collins are hearsay and, in their present form, inadmissible. See Fed. R. Evid. 801, 802. An affidavit or declaration must be based on personal knowledge. Fed. R. Civ. P. 56(c)(4). Plaintiff has not presented any evidence that can be produced in admissible form. See Fed. R. Civ. P. 56(c)(1)(B), (c)(2).

Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008), and

the "task then on summary judgment is to identify situations

that a reasonable jury might find to be so out of the ordinary

as to meet the severe or pervasive criterion," id. at 316.

"[I]solated incidents (unless extremely serious) will not amount

to discriminatory changes in the terms and conditions of

employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788

(1998) (internal quotations omitted).

First, this court finds that Fauber's conduct was not

frequent. Harris, 510 U.S. at 23. Plaintiff has presented

evidence that Fauber hugged Plaintiff four times, rubbed

Plaintiff's hand and arm one time, and touched five employees an

unknown number of times.[3] Plaintiff testified during her

---

[3] This court finds unpersuasive Defendant's argument that
other employees' experiences with Fauber are not relevant to
this court's analysis of whether there was a hostile work
environment. (See Def.'s Reply (Doc. 20) at 6 (citing Honor v.
Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir.
2004)).) In Honor, the Fourth Circuit held that because there
was no evidence on the record that anyone directed "any
racially-offensive conduct" towards the plaintiff, and courts
must "focus on [the plaintiff's] personal experience," other
employees' experiences of racial discrimination do not give rise
to a claim by a plaintiff for a hostile work environment. 383
F.3d at 190. The Fourth Circuit has subsequently clarified,
however, that although "the primary focus in the hostile work
environment analysis is on the plaintiff's experience, evidence
of how others were treated in the same workplace can be relevant
to a hostile work environment claim." Perkins, 936 F.3d at
209-10. The court has further held that "the fact that an
employee does not witness statements made to third parties does
(Footnote continued)

deposition that Fauber visited the restaurant "every week, sometimes twice a week," between February 2018 and early May 2018. (Harris Dep. (Doc. 19-2) at 19, 22-23.) If this court were to find, on the basis of Plaintiff's testimony, that Fauber visited Plaintiff's store at least twelve times - once per month - between February and early May 2018 and that Plaintiff was present for each of those visits, Plaintiff's testimony regarding Fauber's touching incidents would only support a finding that Fauber had physical contact with Plaintiff on less than half of his visits.

Courts addressing similar allegations have consistently held that the conduct was not frequent enough to give rise to an inference that the harassment was pervasive. See, e.g., Rivers v. Time Warner Cable, Inc., No. 3:11-cv-146-RJC-DSC, 2012 WL 2342930, at *4-6 (W.D.N.C. June 20, 2012) (holding that where an employer touched an employee "on the shoulder, arm, or back ten times in a non-sexual manner," that the conduct was not "severe or frequent enough to constitute actionable harassment"); Barber v. City of Conover, 73 F. Supp. 2d 576, 585 (W.D.N.C. 1999)

---

not bar their consideration," so long as a plaintiff was aware of them at the time that they experienced the conduct. Id. at 210. Here, Plaintiff has alleged that other employees complained to her regarding Fauber's conduct, contemporaneous with Plaintiff's own interactions with Fauber. See discussion supra Part III.A.2.a. For this reason, this court finds that other employees' experiences are relevant to this court's analysis.

(holding that where the plaintiff's supervisor "repeatedly hugg[ed] Plaintiff" did not give rise to a hostile work environment) (internal quotations omitted). Consistent with this persuasive precedent, this court does not find that Plaintiff has presented evidence from which a reasonable jury could conclude that Fauber's conduct occurred with such frequency that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult . . . ." Harris, 510 U.S. at 21 (internal quotations omitted).

Second, this court finds that the incidents described were not severe as a matter of law. Harris, 510 U.S. at 23. The evidence before this court is that the conduct consisted of hugs and touches to the arms, back, hips, hands, and hair, all of which lasted a few seconds at most. See discussion supra Part III.A.1.a. Plaintiff concedes that "Fauber's touching and comments to employees was admittedly not severe." (Pl.'s Resp. (Doc. 18) at 12.)

This court agrees. Although evidence of touching incidents may sometimes be sufficient for a plaintiff to survive summary judgment on a hostile work environment claim, the evidence in the instant matter does not resemble that which other courts have found to be severe conduct. See, e.g., Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002) (denial of summary

judgment proper where the plaintiff was subject to daily vulgar insults based on her race and sex, and on one occasion the defendant pressed his penis into her buttocks); Worth v. Tyer, 276 F.3d 249, 268 (7th Cir. 2001) (holding summary judgment to the employer improper where one of several touching incidents was a supervisor touching the employee's breast for several seconds); Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 435–36 (5th Cir. 2005) (holding summary judgment improper where the employee testified that her supervisor fondled her breasts and patted her on her buttocks "numerous times" and came up behind her and rubbed his body against her).

Moreover, courts have found that touching incidents, as described by Plaintiff, are not objectively severe. See, e.g., Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 328 (5th Cir. 2004) (holding that grabbing or brushing up against plaintiff's breasts and behind did not qualify as objectively severe conduct); Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) (characterizing "[a] hand on the shoulder, a brief hug, or a peck on the cheek" as being "relatively minor" acts that "typically will not be severe enough to be actionable in and of themselves"); Shaver v. Dixie Trucking Co., Inc., No. 97-1954, 1999 WL 321388, at *2-3 (4th Cir. May 21, 1999) (holding that two briefs hugs were not severe conduct that gave

rise to a hostile work environment); <u>Pesso v. Montgomery Gen.</u>
<u>Hosp.</u>, No. 98-1978, 1999 WL 326090, at *2 (4th Cir. May 24,
1999) (holding that "innocuous interactions," which consisted of
rubbing the plaintiff's arm and commenting on the plaintiff's
attractiveness were neither severe or pervasive); <u>Back v.</u>
<u>Virginia</u>, Civil Action No. 7:17-cv-00477, 2019 WL 6352657, at *6
(W.D. Va. Nov. 27, 2019) (holding that evidence of workplace
conduct that included hugs and kisses was not severe); <u>Byers v.</u>
<u>HSBC Fin. Corp.</u>, 416 F. Supp. 2d 424, 435 (E.D. Va. 2006)
("While some of the alleged physical contacts may indicate
greater informality and familiarity between a supervisor and her
employee than would be expected after a few weeks of working
together, the contacts amounted to mostly innocuous social
interactions, and none was overtly sexual."); <u>Joiner v. Wal-Mart</u>
<u>Stores, Inc.</u>, 114 F. Supp. 2d 400, 409 (W.D.N.C. 2000) (finding
that "unwelcome kisses on the cheek and hugs" were not severe
conduct); <u>Barber</u>, 73 F. Supp. 2d at 585 (holding that where a
supervisor described as being "clingy" or repeatedly "hugging"
the plaintiff and asking "How's my conduct?" was not sufficient
to give rise to a hostile work environment).

Consistent with these courts' findings, this court does not
find that the conduct was severe as a matter of law.

Third, this court finds that the conduct was not objectively physically threatening or humiliating. Harris, 510 U.S. at 23. For example, all three hugs Plaintiff describes occurred publicly in the workplace, apparently in front of other people. (See Appendix (Doc. 17-2) at 59, 64.) The only statement that is alleged to have accompanied one of the incidents was Fauber's statement that he and Plaintiff would "get along great," (id. at 59), and Plaintiff has not presented evidence that "preface[d], accompan[ied], or follow[ed] the hugs with any words or conduct containing implicit or explicit sexual references." Shaver, 1999 WL 321388, at *3; see also Atkins v. Computer Scis. Corp., 264 F. Supp. 2d 404, 410 (E.D. Va. 2003) (finding that conduct "including full body hugs, pressing her breasts against plaintiff, demanding after hours meetings, and exposing her thighs to plaintiff" was not severe or pervasive when there were no "sexually-oriented comments," and the defendant did not directly proposition the plaintiff for sexual favors).

"Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997) (internal quotations omitted). Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is

sufficiently severe or pervasive as to alter the conditions of that person's employment. Id. at 772-73 (internal quotations omitted). While the hugs and touching incidents may have been unprofessional and inappropriately familiar conduct between a manager and his subordinate, Plaintiff has not offered any evidence to suggest that the conduct was designed to "humiliate, ridicule, or intimidate." Sunbelt Rentals, Inc., 521 F.3d at 315. For this reason, this court does not find that a reasonable jury could conclude that the conduct was objectively physically threatening or humiliating. Harris, 510 U.S. at 23.

Fourth, this court does not find that Fauber's conduct unreasonably interfered with Plaintiff's work performance. Harris, 510 U.S. at 23. Plaintiff argues that Fauber's behavior "interfered with Harris's ability to do her job," (Pl.'s Resp. (Doc. 18) at 13), because Fauber refused to "authorize repairs, omission of Harris from important emails, and refusal to take the steps necessary for Harris to hire new managers all adversely affected Harris's ability as a Unit Director to manage her restaurant." (Id.) This court finds that Plaintiff conflates what is relevant conduct for a hostile work environment action with that in a retaliation action.

In a hostile work environment claim, the relevant analysis is whether "the discriminatory conduct . . . unreasonably

interfere[d] with an employee's work performance," Harris, 510 U.S. at 23 (emphasis added). By contrast, in a retaliation claim, courts must analyze whether an employer took a materially adverse employment action against the employee "that adversely affect[ed] the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted).

The discriminatory conduct at issue in Plaintiff's hostile work environment claim is Fauber's touching Plaintiff and other female employees. (See Pl.'s Resp. (Doc. 18) at 12.) Although Fauber's response to Plaintiff's complaints may have altered the conditions of her employment, and thus, may be relevant to this court's analysis of whether Fauber retaliated against Plaintiff, see discussion infra Part III.B.1.c., Fauber's response is not, in and of itself, discrimination against Plaintiff on the basis of sex. See Harris, 510 U.S. at 23. Accordingly, the adverse employment actions Plaintiff alleges Fauber took against Plaintiff are not relevant evidence for the purpose of a hostile work environment claim.

Instead, the relevant evidence on the record is that Plaintiff's performance did not change while Fauber was her supervisor. During her deposition, Plaintiff testified that the restaurant's sales and revenue performance did not change after

Fauber became the Area Director. (Appendix (Doc. 17-2) at 34-35.) Plaintiff has also presented evidence that, shortly after her termination, she received a trophy in recognition of having had the highest overall customer satisfaction score in her zone. (See Doc. 19-8 at 2).

In the absence of evidence that would demonstrate how Fauber's discriminatory conduct interfered with Plaintiff's work performance, this court finds that Plaintiff's arguments are without an evidentiary basis, and thus, insufficient to withstand summary judgment. Riggins v. SSC Yanceyville Operating Co., 800 F. App'x 151, 155 (4th Cir. 2020) ("While we view evidence in the light most favorable to the nonmoving party, more than a scintilla of evidence is required and mere '[c]onclusory or speculative allegations' are insufficient to withstand summary judgment.") (quoting Hodgin v. UTC Fire & Sec. Ams. Corp., 885 F.3d 243, 252 (4th Cir. 2018)).

"[L]ooking at all the circumstances," Harris, 510 U.S. at 23, this court finds that a reasonable jury could not conclude that Fauber's conduct was severe or pervasive, and thus, that Plaintiff was subjected to a hostile work environment based on

her sex.[4] For this reason, this court will grant Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim.

### 3. Plaintiff's Quid Pro Quo Claim

Defendant argues that Plaintiff's quid pro quo claim should be dismissed because Plaintiff "has never alleged that Fauber made any comments of a sexual nature or even implicitly propositioned her in any way," (Def.'s Br. (Doc. 17) at 17), and because Defendant terminated her employment for legitimate, non-discriminatory reasons, (id. at 18-19).

Plaintiff argues that "[s]ummary judgment is inappropriate when there is uncertainty about whether a nexus exists between harassment and a tangible employment action." (Pl.'s Resp. (Doc. 18) at 14.) Plaintiff also argues that because "Defendant put

---

[4] This court's opinion should not be construed to suggest that hugs and touching can never constitute harassment, nor that the facts require a bright line mathematical analysis to establish harassment through hugs or other unwelcome touching. Certainly, those actions could be the basis of a hostile work environment claim. See, e.g., Zetwick v. Cnty. of Yolo, 850 F.3d 436, 444-45 (9th Cir. 2017) (holding that a reasonable jury could find that a supervisor's hugging was "out of proportion to ordinary workplace socializing and had, instead, become abusive") (internal quotations omitted). There is, however, a distinction between unwelcome or offensive conduct and a hostile or abusive environment. To be actionable, the situation must "be so out of the ordinary as to meet the severe or pervasive criterion." Sunbelt Rentals, Inc., 521 F.3d at 316. Based on the totality of the circumstances, Plaintiff's forecasted evidence fails to meet the severe or pervasive criterion, as a matter of law.

Fauber in charge of the investigation that led to Harris's termination, and he was present when Harris was terminated," Fauber was "clearly a decisionmaker for Harris's termination, easily establishing the nexus between his harassment and the employment decision to terminate Harris." (Id. at 15.)

### a. Applicable Law

There are five elements in the prima facie case for a quid pro quo claim:

1 The employee belongs to a protected group.

2 The employee was subject to unwelcome sexual harassment.

3 The harassment complained of was based upon sex.

4 The employee's reaction to the harassment affected <u>tangible aspects</u> of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

5 The employer, as defined by Title VII, 42 U.S.C. § 2000e(b), knew or should have known of the harassment and took no effective remedial action.

Okoli, 648 F.3d at 222. "The fifth element is automatically met when the harassment was alleged to have been perpetrated by a supervisor." Id. (internal quotations omitted).

"If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action." Id. (citing McDonnell Douglas Corp., 411 U.S. at 802). "Then, if the employer satisfies its burden, the burden returns to the plaintiff to establish that the employer's proffered reason is a pretext for discrimination." Id. at 223.

### b. Analysis

Assuming, without finding, that Plaintiff has met her burden of presenting evidence that satisfies the prima facie elements for a quid pro quo claim, this court finds that summary judgment is appropriate because Defendant has presented evidence that it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

Defendant has presented evidence that Smith, Eubanks, Boyd, and Fauber jointly decided to terminate Plaintiff's employment after employee interviews and Ledford's timekeeping records indicated that Plaintiff had violated Defendant's drug-free workplace policy by failing to immediately terminate Ledford's employment after he was caught smoking marijuana. (Eubanks Decl. (Doc. 17-1) ¶¶ 23-32; id. at 24-27; Appendix (Doc. 17-2) at 80; Doc. 19-7 at 2.) In particular, Eubanks and Smith's emails on April 26, 2018, indicate that they were recommending Plaintiff

be fired from her job, (Eubanks Decl. (Doc. 17-1) at 24), at least one week before Plaintiff alleges she sent her May 4, 2018 email notifying Eubanks that "Fauber has [come] into my store and put his hands on the females that work there," (Eubanks Decl. (Doc. 17-1) ¶ 35), and nearly two weeks before Plaintiff mailed her letter detailing the full account of her complaints against Fauber, (Appendix (Doc. 17-2) at 59, 65.)

Moreover, Defendant has presented evidence that Eubanks' belief that Plaintiff had acted improperly was strengthened on April 30, 2018, when she saw that Plaintiff entered a termination for Ledford into Defendant's personnel system, (see Eubanks Decl. (Doc. 17-1) ¶ 31), as it "made no reference to his having been caught smoking marijuana" and "marked Mr. Ledford as eligible for rehire despite his serious breach of company policy," (id. ¶ 29). Defendant has presented evidence that Plaintiff's "falsification of the termination notice and indication that Mr. Ledford was eligible for re-hire would have been a terminable offense." (Id. ¶ 34.)

Plaintiff does not challenge that the actual reason for Ledford's termination was that he used drugs at the restaurant. (See Pl.'s Resp. (Doc. 18) at 21-22.) Plaintiff testified during her deposition that the termination notes she entered into Bojangles' personnel system on April 30, 2018, were not the

actual reason for Ledford's termination, (Appendix (Doc. 17-2) at 49), and that, although exiting through the back door was a terminable offense, she did not generally punish employees for that conduct, (id. at 51-52). The evidence before this court is that Plaintiff was aware that Ledford would not otherwise be eligible for rehire, which is why she did not enter the actual reason for the termination into the system. (See id. at 48-51.)

Instead, Plaintiff contests when she learned of Ledford's drug use. (Pl.'s Resp. (Doc. 18) at 21-22.) Plaintiff cites her sworn affidavit dated December 28, 2020, (id. at 21 (citing Affidavit of Stacie Harris ("Harris Aff.") (Doc. 19-1)), in which Plaintiff stated that in April 2018, Jester told Plaintiff "over the phone that she 'thought' Chris Ledford was smoking pot." (Doc. 19-1 ¶ 8.) In the affidavit, Plaintiff stated that she told Jester to send Ledford home, not to let him work, and that Plaintiff would investigate. (Id.) Plaintiff stated that she "terminated Chris the first opportunity [she] had to talk to him," after he admitted to smoking on the job, (id. ¶¶ 9-10), which occurred during "the next shift that [she] worked that he was scheduled to come in, within a week of [Jester] telling [her] that she thought he smelled marijuana on him." (Id. ¶ 11.) Relying on her statements in the affidavit, Plaintiff argues that she merely delayed entering Ledford's termination

transaction in Defendant's personnel system, rather than failing to terminate Ledford's employment. (Pl.'s Resp. (Doc. 18) at 21-22.)

The timeline Plaintiff presents in her affidavit differs from that she described during her deposition testimony on October 7, 2020, in which she testified that Jester called her in March 2018 to tell Plaintiff that Jester had "smelled pot on Chris when he took the trash out," and that Ledford had admitted to using marijuana. (Appendix (Doc. 17-2) at 46-47, 50.) Plaintiff testified during her deposition that she told Jester to "send him home," and that she "told the managers to not let him work if he showed up, because he was scheduled to open." (Id. at 47.)

This court declines to find that Plaintiff has created a genuine issue of material fact as to when Ledford was caught smoking marijuana by presenting her conflicting affidavit. The Fourth Circuit has held that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); see also Williams v. Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015) ("It is well-settled that a plaintiff may not avoid summary judgment by submitting

contradictory evidence."); In re Family Dollar FLSA Litig., 637
F.3d 508, 513 (4th Cir. 2011) (holding that where a plaintiff's
deposition testimony and later affidavit were "inconsistent,"
the court would "disregard her affidavit and rely on the
testimony she gave in her deposition"). "If a party who has been
examined at length on deposition could raise an issue of fact
simply by submitting an affidavit contradicting his own prior
testimony, this would greatly diminish the utility of summary
judgment as a procedure for screening out sham issues of fact."
Barwick, 736 F.2d at 960 (internal quotations omitted). In
accordance with Fourth Circuit precedent, this court finds that
Plaintiff's affidavit does not create a genuine dispute of
material fact as to whether Ledford's termination occurred in
March 2018 or in April 2018. Accordingly, this court finds that
the evidence on the record from Plaintiff's deposition supports
a finding that Plaintiff learned of Ledford's drug use in March
2018, (Appendix (Doc. 17-2) at 46-47, 50), which would support
Defendant's proffered reason for Plaintiff's termination - that
Plaintiff delayed firing Ledford, in violation of Defendant's
drug-free workplace policy. (Eubanks Decl. (Doc. 17-1) ¶¶ 23-32;
id. at 24-27; Appendix (Doc. 17-2) at 80; Doc. 19-7 at 2.)

Moreover, even if Plaintiff "was fired for misconduct she
did not actually engage in, that is unfortunate, but a good-

faith factual mistake is not the stuff of which Title VII violations are made." <u>Villa v. CavaMezze Grill, LLC</u>, 858 F.3d 896, 903 (4th Cir. 2017). Even taking Plaintiff's allegations regarding the timing of Ledford's termination in the light most favorable to Plaintiff, the evidence before this court is that Eubanks, Smith, Fauber, and Boyd believed, based on Ledford's time records, employee interviews, and the termination transaction, that Plaintiff had declined to terminate Ledford's employment in accordance with company policy. (<u>See</u> Eubanks Decl. (Doc. 17-1) ¶ 31; <u>id.</u> at 24-26.) "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 960-61 (4th Cir. 1996) (internal quotations omitted).

Violation of workplace rules is a legitimate reason for discharge, <u>Worster v. U.S. Postal Serv.</u>, 132 F. Supp. 2d 397, 405-06 (M.D.N.C. 2001), <u>aff'd</u>, 28 F. App'x 324 (4th Cir. 2002). Defendant has presented evidence that Defendant terminated Plaintiff's employment for failing to abide by Defendant's policies. Accordingly, this court finds that Defendant has met its burden in demonstrating that it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

This court further finds that Plaintiff has not presented evidence that Defendant's "stated reasons for terminating her

were not the real reasons for her discharge," <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 279 (4th Cir. 2000). Citing the U.S. Court of Appeals for the D.C. Circuit's opinion in <u>Mastro v. Potomac Electric Power Co.</u>, 447 F.3d 843, 855-57 (D.C. Cir. 2006), Plaintiff argues that Defendant's investigation was "intentionally unfair," and thus, pretextual, (Pl.'s Resp. (Doc. 18) at 22), because Fauber and Boyd failed to speak to Plaintiff during the course of the investigation and that "Eubanks, who dispatched Fauber, was aware when she did so of Harris's complaints about him," (<u>id.</u> at 23).

This court disagrees. In <u>Mastro</u>, the D.C. Circuit found that the investigation "lacked the careful, systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and livelihood depended," because the company interviewed very few employees and because one key witness against the plaintiff was someone who had displayed "major insubordination" towards the plaintiff in the past. 447 F.3d at 855. By contrast, Defendant has presented evidence that its employees thoroughly investigated the claims against Plaintiff, including reviewing Ledford's time records, interviewing multiple employees, and reviewing the termination transaction Plaintiff entered into the personnel system. (<u>See</u> Eubanks Decl. (Doc. 17-1) ¶ 31.) Moreover, the evidence before

this court is that Eubanks and Smith recommended Plaintiff's termination at least one week before Eubanks became aware of Plaintiff's allegations against Fauber. (See Eubanks Decl. (Doc. 17-1) ¶ 35; id. at 24-26.)

"[T]he fact that the investigation may not have been as thorough as [the plaintiff] would have liked does not establish pretext." Nnadozie v. ManorCare Health Servs., LLC, 792 F. App'x 260, 262 (4th Cir. 2019) (citing Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011)). Because this court does not find that Plaintiff has carried her burden in demonstrating that Defendant's explanation is pretextual, this court will grant Defendant's motion for summary judgment with regard to Plaintiff's quid pro quo claim.

## B. Retaliation Claim

Plaintiff also alleges "Retaliation Discrimination" in violation of Title VII. (Compl. (Doc. 1) ¶¶ 53-56.)

Title VII prohibits employers from "retaliating against a worker for either participating in a Title VII proceeding or opposing an employer's discriminatory practices." Perkins, 936 F.3d at 213 (internal quotations omitted). To establish a prima facie claim of retaliation, a plaintiff must show (1) that she engaged in protected activity; (2) that the employer took a materially adverse action against her; and (3) there is a causal

connection between the protected activity and the adverse action. Id. Once a plaintiff establishes the prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory reason for the adverse employment action. See McDonnell Douglas Corp., 411 U.S. at 802.

Defendant argues that this court should grant summary judgment as to Plaintiff's retaliation claim because the primary decisionmakers were unaware of her allegedly protected activity, (Def.'s Br. (Doc. 17) at 19-20), there is not a causal connection between her alleged protected activity and her termination, (id. at 20-21), and because Defendant had a legitimate, non-retaliatory reason for terminating Plaintiff's employment, (id. at 21-23).

Plaintiff argues that because there is "a close temporal proximity between Harris's complaints and her termination," as well as "evidence of retaliatory animus during the intervening period," Defendant's motion should be denied. (Pl.'s Resp. (Doc. 18) at 20.)

This court finds that Plaintiff has not presented evidence from which a reasonable jury could conclude that there was a causal connection between her termination and her complaints about Fauber's conduct.

**1. Plaintiff has not presented evidence that Smith and Eubanks were aware of Plaintiff's complaints against Fauber when they recommended her termination.**

This court finds that Plaintiff has not met her burden in presenting evidence of a causal connection between Smith and Eubanks' participation in the decision to terminate Plaintiff's employment and Plaintiff's complaints against Fauber.

Based on the evidence on the record, this court finds that Smith and Eubanks were unaware of Plaintiff's complaints against Fauber at the time that they recommended her termination. Plaintiff testified during her deposition that in "January, or probably February," she wrote an email to Eubanks stating that she "was trying to get a hold of Ben Boyd because [she] was having problems with [her] area director and he would not respond . . . ." (Appendix (Doc. 17-2) at 17.) This court does not find that a reasonable jury could conclude based on this email that Eubanks was aware of the nature of Plaintiff's allegations against Fauber. Instead, the evidence before this court is that Smith and Eubanks did not become aware of Plaintiff's complaints against Fauber until May 4, 2018, more than one week after they had recommended her termination. (Eubanks Decl. (Doc. 17-1) ¶ 35; id. at 24-26.)

"Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's

knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Moreover, an employer's decision to follow through on an adverse employment action "previously contemplated, though not yet definitively determined" following notification of a protected activity, "is no evidence whatever of causality." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Because the evidence on the record is that Smith and Eubanks, as "relevant decisionmaker[s] [were] unaware that the plaintiff had engaged in a protected activity," Dowe, 145 F.3d at 655, when they originally recommended Plaintiff's employment be terminated on April 26, 2018, a reasonable jury could not find that there was a causal connection between Plaintiff's termination and her subsequent communications to Eubanks.

2. **Plaintiff has not presented evidence of a causal connection between Boyd's decision to terminate her employment and his awareness of her complaints against Fauber**

Moreover, taking Plaintiff's allegations that she complained to Boyd in the light most favorable to Plaintiff, the time period between her alleged complaint to Boyd and her termination are too tenuous to support a finding of a causal connection between the two, as a matter of law.

Plaintiff testified during her deposition that Boyd and Fauber came by her store on February 16, 2018, in response to a request by Plaintiff to speak with Boyd. (Harris Dep. (Doc. 19-2) at 18.) Plaintiff testified that she told Boyd that "every time that Tommy Fauber came into the store he touched employees and he made them feel extremely uncomfortable," although she did not disclose the names of those employees. (Id. at 27.) Plaintiff further testified that Fauber hugged her at the end of the meeting. (Id. at 28.) Plaintiff testified that Boyd witnessed the hug and said to Plaintiff that Fauber "was a friendly guy" and that "he did not mean anything by that." (Id.) Plaintiff does not present any direct evidence that links her conversation with Boyd and her termination, instead arguing that the "three months" between her termination and her complaints to Boyd are a "short time frame" that is indicative of causation through temporal proximity. (Pl.'s Resp. (Doc. 18) at 19.)

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark Cnty Sch. Dist., 532 U.S. at 273 (internal quotations omitted). Although the Fourth Circuit and the Supreme Court have not adopted a "bright

temporal line," these courts have consistently held that a three-to-four-month lapse between the protected activities and discharge is too long to establish a causal connection by temporal proximity alone. See, e.g., id. at 273-74 (citing cases concluding three and four-month periods between a protected activity and the adverse action did not establish causation); Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012) (three months was insufficient to establish causation); Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (same); King v. Rumsfeld, 328 F.3d 145, 161 n.5 (4th Cir. 2003) (finding a ten-week separation "is sufficiently long so as to weaken significantly the inference of causation"). In light of these decisions, this court finds, as a matter of law, that the alleged three-month gap between Plaintiff's complaints to Boyd and her termination is insufficient to serve as evidence that Boyd retaliated against her.

### 3. Plaintiff has not presented evidence of a causal connection between Fauber's decision to terminate her employment and Plaintiff's complaints against Fauber.

This court also does not find that Plaintiff has presented evidence from which a reasonable jury could conclude that there was a causal connection between Plaintiff having complained to Fauber and her termination. Relying on the Fourth Circuit's holding in Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir.

2007), (Pl.'s Resp. (Doc. 18) at 18), Plaintiff argues that "the short time frame" of "three months" between Plaintiff's complaints to Fauber and her termination, in addition to "smaller acts of retaliation in the interim," establish causation, (id. at 19).

This court disagrees. Although "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation," where "temporal proximity between protected activity and allegedly retaliatory conduct is missing," Lettieri, 478 F.3d at 650, this court does not find that the conduct Plaintiff describes serves as intervening acts, as a matter of law.

During her deposition, Plaintiff stated that Fauber did not sign off on repairs to the store, including repairs to the ceiling tiles and the security camera, that Fauber left her off an email to a vendor regarding a ranch dressing shortage, and that Fauber did not return the manager book for a manager trainee after it was submitted in March 2018. (Harris Dep. (Doc. 19-2) at 56-58.)

"An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S.

53, 68 (2006). Instead, Title VII's "antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." Id. (internal quotations and citations omitted).

Unlike the plaintiff in Lettieri, whose employer "stripped her of significant job responsibilities," Lettieri, 478 F.3d at 649, a reasonable jury could not conclude that the acts Plaintiff allege rise to the level of retaliatory conduct. Compare Murphy-Taylor v. Hoffman, 968 F. Supp. 2d 693, 707 (D. Md. 2013) (finding ongoing animus where a supervisor refused to quash rumors about plaintiff, refused to prevent contact between plaintiff and her alleged harasser, and gave plaintiff a poor performance review) and Elder v. DRS Techs., Inc., No. 1:13cv799 (JCC/TRJ), 2013 WL 4538777, at *7 (E.D. Va. Aug. 27, 2013) (finding retaliatory animus where, in the intervening period, the plaintiff's employer deployed him to active combat zones in violation of its own policies and placed him in life-threatening situations), with Spencer v. Virginia State Univ., 224 F. Supp. 3d 449, 460-61 (E.D. Va. 2016) (finding no retaliatory animus even where plaintiff was described as a "trouble maker" and criticized over email) and Reardon v.

Herring, 201 F. Supp. 3d 782, 788-89 (E.D. Va. 2016) (finding no ongoing animus where plaintiff alleged that after plaintiff's complaint, her supervisor "rarely spoke to" and "actively avoided" plaintiff, assigned a desirable office location to another employee, and did not congratulate plaintiff for a workplace accomplishment).

Because this court finds that the "smaller acts" Plaintiff complains of, (Pl.'s Resp. (Doc. 18) at 19), do not rise to the level of ongoing retaliation, Plaintiff has not met her burden in showing that there was a causal connection between her complaint to Fauber about his conduct and her termination.

### 4. **This court has found that Defendant has met their burden in demonstrating that it had a legitimate, non-discriminatory reason for terminating Plaintiff**

Summary judgment is appropriate because Plaintiff has not presented evidence of a causal connection between her termination and her complaints against Fauber, the third element of a retaliation claim. Perkins, 936 F.3d at 213.

Even if Plaintiff were successful in providing evidence that would satisfy this element of the prima facie case, summary judgment would still be appropriate because this court has found that Defendant has presented evidence that it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and Plaintiff has not provided evidence from which a

reasonable jury could conclude that this reason was pretextual. See discussion supra Part III.A.2.b.

Accordingly, this court will grant Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

IV. **CONCLUSION**

For the reasons set forth above, this court finds that Defendant's Motion for Summary Judgment, (Doc. 16), will be granted.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 16), is **GRANTED** as to all claims.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 2nd day of July, 2021.

_____
United States District Judge